## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Plassein International Corporation, *et. al.*, | ) | Case No. 03-11489 (KG) |
| (n/k/a PL Liquidation Corp.), | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | **Re Dkt Nos. 1574, 1629 & 1632** |

## MEMORANDUM OPINION[1]

The Court has been asked to resolve a dispute involving the interpretation of a settlement agreement which the Court previously approved.   The decision will determine the funds available for distribution to creditors.

### I. BACKGROUND[2]

Plassein International Corp. and affiliated companies ("Debtors" or "Estate")[3] filed these cases in May 2003.   In connection with the filing, Debtors filed a motion to sell

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this matter by Federal Rule of Bankruptcy Procedure 9014.

[2] The cases were assigned to the author of this Opinion on April 18, 2006, subsequent to most of the recited significant events.

[3] The Debtors are PL Liquidation Corp., f/k/a Plassein International Corp., PL Liquidation of Martin, Inc., f/k/a Plassein International Martin, Inc., PL Liquidation of Ontario, LLC, f/k/a Plassein International of Ontario, LLC, PL Liquidation of Salem, Inc., f/k/a Plassein International of Salem, Inc., PL Liquidation of Spartanburg, Inc., f/k/a Plassein International of Spartanburg, Inc., PL Liquidation of Thomasville, Inc., f/k/a Plassein International of Thomasville, Inc., and PL Liquidation of Tfilms, Inc., f/k/a Teno Films, Inc., a wholly-owned subsidiary of Thomasville, Inc.

substantially all of their assets to Exopack-Ontario, Inc. ("Exopack"). Fleet Capital Corporation, as agent for a group of lenders ("Fleet")[4] agreed to finance the Debtors during their Chapter 11 proceedings to effectuate the sale to Exopack.[5] Consummating a sale with Exopack was difficult and highly contentious, with numerous revisions to the Purchase and Sale Agreement ("APA"), resulting in a substantial reduction in the purchase price from approximately $60,000,000 to approximately $20,000,000. Ultimately, in September 2003, the Court entered an Order approving the sale to Exopack and authorizing the Debtors to pay all of the proceeds of the sale to Fleet. [Docket No. 635]. In October 2003, the cases were converted to cases under Chapter 7, and the Court appointed an interim trustee. [Docket No. 729]. The Estate was administratively insolvent. Fleet was asserting a priority administrative claim in the approximate amount of $16,000,000, and there were unpaid Chapter 11 professional fees aggregating almost $3,000,000. [Affidavit of William A. Brandt, Jr., Trustee, dated July 24, 2007 ("Trustee Affidavit"), ¶ 2. [Docket No. 1632]

In December 2003, the creditors elected William A. Brandt, Jr., as Trustee. His

---

[4] The group of lenders consisted of Fleet Capital Corporation, Fleet National Bank, Heller Financial, Inc., Wachovia Bank, N.A., and Citizens Bank of New Hampshire. The Court's reference to "Fleet" will include the group of lenders including Fleet, for itself and as agent.

[5] On May 16, 2003, the Court entered an interim order ("Interim Order") granting the Debtors authority to incur post-petition secured debt (Interim Order at ¶ 1), and granting Fleet liens on all property of the estates other than avoidance actions (Interim Order at ¶ 5), deemed such liens perfected (Interim Order at ¶ 7), acknowledged the Debtors' pre-petition obligations to, and liens of, the Agent under the pre-petition credit documents (Interim Order at ¶¶ F-1, M, 5, 9, 12, 14, 15, 20 and 23), and granted the Agent super-priority administrative claims (Interim Order at ¶ 10). Thereafter, the Court entered a series of eleven additional interim orders, all of which granted Fleet the same or similar relief provided in the Interim Order.

election was disputed, and the Court resolved the disputed election by Order, dated February 4, 2004, confirming the election [Docket No. 915]. The Trustee inherited a bitter dispute among Fleet, the Estate and the Estate's professionals over the amount of Chapter 11 professional fees and whether the proceeds of the sale paid to Fleet could be surcharged for the professional fees. [Trustee Affidavit ¶ 3]. In addition, the purchaser, Exopack, was making claims ("the Exopack Claim") under the APA for alleged breaches of various representations and warranties and was asserting a claim to certain proceeds of the sale that were held in escrow and additional claims for damages above the holdback against the Estate and Fleet. [Docket No. 1028; Trustee Affidavit ¶ 2].

Upon his appointment, the Trustee assumed the obligation to pursue the Section 506(c) claim against Fleet and to resolve the professional fees disputes. Ultimately, the Trustee, through mediation, resolved the objections to fees and the Section 506(c) claim relating to those fees. Through the Trustee's efforts, a compromise was reached whereby the professionals agreed to certain reductions in their fees and Fleet agreed to pay those fees from the proceeds of the sale. [Trustee Affidavit ¶ 3]. The Trustee then addressed the Exopack Claim, and negotiated a compromise among the Estate, Exopack and Fleet whereby Exopack released certain claims against Fleet, and the Estate and Fleet released certain of the holdback funds to Exopack. When Exopack refused to honor its obligations under the settlement terms to pay certain taxes, the Trustee commenced an adversary proceeding.[6] The

---

[6] *William A. Brandt, Jr., as the Chapter 7 Trustee v. Exopack-Ontario, Inc., et al.*, Adv. Proc. No. 05-30165(KG).

3

parties settled the adversary proceeding with Exopack paying the Trustee the amount due for taxes, thereby enabling the Trustee to pay all outstanding taxes. Fleet compensated the Trustee in the sum of $50,000 for his expenses in obtaining the recovery from Exopack.

Having resolved the unpaid professional fees issues and the Exopack Claim, the Trustee then entered into discussions with Fleet to resolve the Trustee's potential claims against Fleet, including a claim that Fleet's liens could be avoided as fraudulent conveyances. Those negotiations ultimately resulted in the settlement agreement that is the subject matter of the present dispute. *See infra*, at pp. 4-7.

On January 23, 2007, the Trustee filed a motion seeking authority to make an interim distribution to creditors other than Fleet ("Interim Distribution Motion") [D.I. 1557], which proposed to pay the expenses of administration and to make an interim distribution to unsecured creditors. On February 21, 2007, Fleet filed an objection to the Interim Distribution Motion ("Objection") [D.I. 1573]. In addition, Fleet filed a Motion to Compel Trustee to Perform Under the Settlement Agreement ("Motion to Compel") [D.I. 1574]. On March 14, 2007, the Trustee and the Agent entered into a Consent Order, partially resolving the Motion to Compel, pursuant to which the Trustee paid Fleet $1 million and Fleet adjourned the Motion to Compel. [D.I. 1595].

**The Settlement Agreement between the Trustee and Fleet**

At the time the cases were converted, several contested matters and adversary proceedings were pending against Fleet. On March 3, 2005, all of the pending matters were

4

settled pursuant to a settlement agreement between the Trustee and Fleet ("Settlement Agreement") which the Court approved. [D.I. 1132].  The Settlement Agreement provided that Fleet waive its priority administrative claim, waive any secured claim, and the Estate agreed to grant Fleet an allowed unsecured claim of $23,675,045.65.  Fleet further agreed to pay the Estate the sum of $3,100,000 and waive any right to any distribution as an unsecured creditor from the $3,100,000[7] paid, plus waive any right to a distribution from the first $1.1 million of preference recoveries. [Settlement Agreement ¶ 4(b)].  In exchange and after it received the $1.1 million, the Estate agreed to pay Fleet any net recoveries up to $3,100,000,[8] and then share equally any subsequent net recoveries above $3.1 million.

The relevant provisions of the Settlement Agreement are as follows:

### Section 2.

**Scope of Settlement.** [T]his [Settlement] Agreement is intended to globally settle with prejudice any and all claims (pre-petition and post-petition) the Trustee and the Debtors' estates have or may have . . .. Without limiting the generality of the foregoing, this [Settlement] Agreement will completely resolve and be deemed as a settlement with prejudice of . . . claims for . . . the liquidation, collection and disbursement of other estate assets, No further claims can be asserted, whether direct or indirect, against any or all of Agent, Lenders and Heller, their respective professionals and advisors, or against any proceeds received by

---

[7]  The payment was $3,000,000 from Fleet and $100,000 from Heller Financial to resolve certain related claims against Heller Financial.  For the sake of clarity, the Court will refer only to "Fleet."

[8]  At the time of the Settlement, the best estimate of likely preference recoveries was less than $1,100,000.  Thus, it was contemplated that any distribution to Fleet would be first from recoveries from non-preference claims. [Trustee Affidavit ¶ 9].

any of them from any Plassein entity, and/or any representative thereof.[9]

## Section 3.

**Settlement Payment.**  Lenders shall pay to the Trustee the amount of Three Million and 00/100 Dollars ($3,000,000.00) and Heller shall pay to the Trustee the amount of One Hundred Thousand and 00/100 Dollars ($100,000.00) in cash upon approval of the Agreement by the Court by a final order (together, the "Settlement Payment").

## Section 4.

**Distribution of Estate Property.**  Distribution of property of the Debtors' estates by the Trustee shall be as follows:

a.   the Settlement Payment plus any amounts to be retained by the Debtors' estates described in Paragraphs 4.b, 4.c, 4.d, 4.e and 13.d below shall be used to pay allowed administrative claims of the Debtors' estates and creditors other than the Lenders and Heller in the order of priority pursuant to Bankruptcy Code § 726 or other order of the Court that is not inconsistent herewith;

b.   up to One Million One Hundred Thousand and 00/100 Dollars ($1,100,000.00) of gross preference recoveries pursuant to Bankruptcy Code §§ 547 and 550 shall be distributed to creditors of the Debtors' estates other than Lenders and Heller in the order of priority pursuant to Bankruptcy Code § 726 or other order of this Court that is not inconsistent herewith.  Gross preference recoveries in excess of $1,100,000.00 shall be distributed to the Lenders pursuant to 4(c) below;

c.   subject to 4(a) and above, the Agent on behalf of the Lenders shall receive the sum of Three Million One Hundred

---

[9]  The Settlement Agreement provides that all claims against Fleet are settled.  It does not constitute a waiver and release of claims against the Estate or the assertion of liens against property of the Estate.

6

Thousand and 00/100 Dollars ($3,100,000.00) of net recoveries from any source.  Recoveries by the Trustee in excess of the amount payable to the Lenders in accordance with the sub-section (c) shall be distributed to creditors of the Debtors' estates and to the Lenders as provided below;

d.   after the Lenders have received the sum of Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00) (and subject to 4(b) above), except as provided in paragraph 4(g) hereof, all further net recoveries (funds available for distribution to creditors pursuant to Bankruptcy Code § 726(a)(2)) shall be divided and distributed by the Trustee 50% to the Lenders and the remaining 50% to the creditors of the Debtors' estates other than Lenders and Heller, or in accordance with other order of the Court that is not inconsistent herewith; and

e.   once allowed claims of unsecured creditors of the Debtors, other than the Lenders' and Heller, are paid in full, including, without limitation, the allowed claims fo the Senior Sub-Debt and Junior Sub-Debt, as defined below, the balance of any funds available for distribution pursuant to Bankruptcy Code § 726(a)(2) shall be paid to the Lenders.  Conversely, once the Lenders' Allowed Unsecured Claim, and Heller Unsecured Claim, both as defined below, are paid in full, any funds available for distribution pursuant to Bankruptcy Code § 726(a)(2) shall be distributed to allowed claims of the other unsecured creditors until paid in full, and then to equity.

Fleet paid $3.1 million to the Trustee, constituting the full Settlement Payment.  As a result of the Settlement Agreement, the Debtors' estates had a potential fund of $4.2 million, with $3.1 million in hand, plus the first preference recoveries of $1.1 million to be collected, available to pay allowed administrative claims and to make distributions to creditors.

**Preference Recoveries**

The Trustee collected $2,445,519 from preference actions.  In collecting the preferences, Debtors incurred counsel fees of approximately $593,852, plus costs (including mediators' fees).  The Trustee also incurred the fees and expenses of his consultant, Development Specialists, Inc., in excess of $200,000 in fees, plus expenses.

**Jurisdiction and Venue**

The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This Court is the proper venue for this motion under 28 U.S.C. §§ 1408 and 1409.  This motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief Fleet seeks is Bankruptcy Code § 105(a).

## II.  DISCUSSION

The parties find themselves in a good faith disagreement over the interpretation of terms of the Settlement Agreement they negotiated to resolve a highly contentious relationship.  As is not uncommon, the dispute over the Settlement Agreement arose when the Debtors were more successful than expected in recovering funds for distribution and the meaning of provisions of the Settlement Agreement was no longer merely an academic exercise.  The parties agree that at the time they negotiated the Settlement Agreement, everyone believed that there would be little, if any, money from preference recoveries to be distributed and therefore the provisions of the Settlement Agreement at issue here would not come into play.  Instead, the Trustee's vigorous efforts resulted in funds worth a fight.

8

Fleet has moved for summary judgment on its interpretation of the Settlement Agreement.  The Trustee in its opposition to the Motion argued that if the Court were to determine that there was an ambiguity in the Settlement Agreement, the Court should deny the Motion because genuine issues of material fact would exist.   Nonetheless, at oral argument both parties agreed that an evidentiary hearing would be wasteful of time and money and, in effect, have asked the Court to resolve the dispute by interpreting the Settlement Agreement.  Fleet and the Trustee therefore agree that disposition of their dispute by summary judgment is both useful and appropriate.

The Trustee and Fleet agree on the applicable legal precepts, namely:[10]

(a)     The Court must determine the parties' intention from the express language of the agreement.  *E.I. du Pont de Nemours and Co. v. Shell Oil Co.*, 498 A.2d 1108 (Del. 1985); *Radio Corp. of America v. Philadelphia Storage Battery Co.*, 6 A.2d 329 (Del. 1939); *Pennwalt Corp. v. Plough Inc.*, 676 F.2d 77, 80 (3d. Cir. 1982); and construe their intention from the entire agreement, giving effect to all of the provisions.  *State v. Dabson*, 217 A.2d 497 (Del. 1966); *Bandad Mechanic Co. v. United Technologies Corp.*, 586 F. Supp. 551 (D. Del. 1984).

A contract is ambiguous only when the provisions in controversy are fairly susceptible to different interpretations or may have two or more different meanings.  *See Rhone-Poulenc Basic Chemical Co. v. American Motorist Ins. Co.*, 616 A.2d 1192 (Del. 1992).  The Court

---

[10] The Settlement Agreement provides that Delaware law governs in any dispute.  Settlement Agreement, ¶ 18.

should not look outside the four corners of the contract and the clear and unequivocal language in the absence of an ambiguity. Here, the parties agree the Settlement Agreement is not ambiguous. They disagree, however, on what it means and ask the Court to tell them.

The parties' interpretations of the Settlement Agreement leave little, if any, middle ground, as the following recitations of the parties' respective interpretations of the Settlement Agreement reveal the gulf between them.

## Preference Recoveries

### Fleet's Position

The Settlement Agreement required the Trustee to distribute to Fleet gross preference recoveries in excess of $1.1 million. Paragraph 4 of the Settlement Agreement is the distribution mechanism to which Fleet points to support its argument[11]:

> **Distribution of Estate Property.** Distribution of property of the Debtors' estates by the Trustee shall be as follows:
>
> a.  The Settlement Payment plus any amounts to be retained by the Debtors' estates . . . shall be used to pay allowed administrative claims of the Debtors' estates and creditors other than [Fleet] . . .;
>
> b.  Up to One Million One Hundred Thousand and 00/100 Dollars ($1,100,000.00) of gross preference recoveries . . . shall be distributed to creditors of the Debtors' estates other than [Fleet] . . . .Gross preference recoveries in excess of $1,100,000.00 shall be distributed to the Lenders pursuant to 4(c) below [limited to the sum of $3.1 million from gross preference recoveries and net proceeds from any other source];

---

[11]  The recitation of Paragraph 4 is lifted from Fleet's submission and with Fleet's editing states Fleet's interpretation.

c.  Subject to 4(a) [excluding amounts to be retained by the estate] and (b) [limited to gross preference recoveries in excess of $1.1 million] [Fleet] shall receive the sum of Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00) of net recoveries from any source.

d.  after [Fleet] has received the sum of Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00)... all further net recoveries (funds available for distribution to creditors pursuant to Bankruptcy Code § 726(a)(2)) shall be divided and distributed by the Trustee 50% to [Fleet] and the remaining 50%, to the creditors of the Debtors' estates other than [Fleet]

The Settlement Agreement allocates the risk of administrative expenses, including, without limitation, the costs of collection of the preference recoveries, to the Estate.    If the Trustee collects in excess of $1.1 million of gross preference recoveries, then the Estate has a fund of $4.2 million to "pay allowed administrative claims of the Debtors' estates and creditors other than [Fleet] in the order of priority pursuant to Bankruptcy Code § 726 or other order of the Court that is not inconsistent" with the Settlement Agreement.

The Trustee collected $2,445,519 of gross preference recoveries.  Pursuant to the Settlement Agreement the Trustee retains for the estates the first $1.1 million of the gross preference recoveries.   Settlement Agreement at ¶ 4(b).  The Trustee disburses "gross preference recoveries in excess of $1,100,000.00 . . . to [Fleet]."  Settlement Agreement at ¶ 4.b.  This leaves $1,345,519 in gross preference recoveries that belong to [Fleet] under the Settlement Agreement in excess of the $1.1 million allocated to the Estate.

In addition to the gross preference recoveries to which Fleet is entitled, the Settlement Agreement obligates the Trustee to disburse to Fleet the net recoveries from all other sources, including a $50,000 escrow relating to the insurance retainage, described more fully in Paragraph 13(a) of the Settlement Agreement.  In addition to the insurance retainage escrow, Fleet is entitled to distribution from the following sources:

| | |
|---|---|
| Refunds | $ 78,899 |
| Turnover from prior trustee | $ 45,014 |
| Bank accounts | $142,563 |
| Interest | $ 59,009 |

Fleet therefore is entitled to gross preference recoveries in excess of $1.1 million in the amount of not less than $1,345,519, other net recoveries and proceeds in an amount to be determined, funding of a reserve in the amount of $270,000 (see discussion of the Exopack Settlement, below) pursuant to paragraphs 7 and 8 of the Settlement Agreement, and accounting for expenses.

### Trustee's Position

Fleet asserts it is entitled to the gross preference recoveries in excess of $1.1 million. In support of that position, Fleet relies upon Paragraph 4(b) of the Settlement Agreement. However, Fleet's reading of Paragraph 4(b) is far too narrow and fails to give effect to all language of the paragraph.  Paragraph 4(b) of the Settlement Agreement provides that gross preference recoveries in excess of $1.1 million are to be distributed to Fleet "**pursuant to Paragraph 4(c)**." (*emphasis added*).   Paragraph 4(c) provides that Fleet receives net

12

recoveries from any source up to the first $3.1 million.  Reading Paragraphs 4(b) and 4(c) together, it is clear that the gross preference recoveries in excesss of $1.1 million are to be distributed pursuant to Paragraph 4(c) after the costs to the Estate are deducted.  From that net recovery, the first $3.1 million is disbursed to Fleet.

The reason the term "gross preference recoveries" is used in Paragraph 4(b) is because if net recoveries were provided for in Paragraph 4(b) and the net balance was then disbursed pursuant to Paragraph 4(c), those net recoveries would be subject to a second charge for expenses of the Estate.  Thus, Paragraph 4(b) used the term "net recoveries" to avoid a double assessment against gross recoveries in excess of $1.1 million. [Trustee Affidavit ¶ 12].

Fleet's reading of Paragraph 4(b) of the Settlement Agreement ignores the words "pursuant to 4(c) below."  Fleet incorrectly interprets Paragraph 4(b) as independently requiring disbursement of gross proceeds to Fleet without regard to Paragraph 4(c).  Such an interpretation is inconsistent with the language and fails to give full effect and meaning to the language.

As noted, when the Settlement was being negotiated, it was the parties' expectation that preference recoveries would be less than $1.1 million. [Trustee Affidavit ¶ 9].  It was only through the extraordinary effort of the Trustee and his counsel that the Estate recovered $2,345,519.  [Trustee Affidavit ¶ 10].  In order to make this recovery, the Estate incurred expenses for counsel fees of $593,852, plus costs.  In addition, DSI provided services to the

Trustee with a fair value in excess of $200,000 by providing all the financial analysis needed to successfully prosecute the preference claims. [Trustee Affidavit ¶ 11]. The Estate, if Fleet prevails, loses the fees and associated costs incurred to recover $2,345,519. Paragraphs 4(b) and 4(c) must be read together in which case the Settlement Agreement clearly and unambiguously provides that the preference recoveries in excess of $1.1 million are to be distributed to Fleet after deduction of expenses.

Therefore, the distribution due Fleet for the preference recoveries is $1,345,519, less the interim distribution to Fleet of $1,100,000, less costs and expenses.

## II. RULING

The Trustee and Debtors agree on one thing, namely, that there are no disputes on the facts and an evidentiary hearing would be a wasteful exercise. The Court agrees with the parties that there are no disputed facts and summary judgment is appropriate. F.R. Civ. P. 56(c); *In re LaRoche Industries, Inc.*, 284 B.R. 406, 408 (Bankr. D. Del. 2002). Instead, they have asked the Court to tell them what their Settlement Agreement means. The parties also agree that the Settlement Agreement is unambiguous and, therefore, the Court may properly interpret the Settlement Agreement using the rules of construction of contracts: applying the express language, determining the parties' agreement from the entirety of the agreement, and giving effect to each term so no provision is useless.

In this case, in addition to the rules of construction discussed earlier (pp. 9-10) the Court will employ another rule of construction to determine the objective intent of the parties

which is, as the Third Circuit Court of Appeals has indicated, "a court's paramount

consideration" in construing a contract. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*,

619 F.2d 1001, 1009 (3d Cir. 1980).  In *Mellon*, the Third Circuit, quoting from *O'Bryan v.*

*O'Bryan*, 787 A.2d 15, 18 (Conn. App. 2001), stated:

> In ascertaining intent, we consider not only the language in the
> contract but also the circumstances surrounding the making of
> the contract, the motives of the parties and the purposes which
> they sought to accomplish . . . . The intention of the parties to a
> contract is to be determined from the language used interpreted
> in the light of the situation of the parties and the circumstances
> connected with the transaction.

The Court's interpretation of the Settlement Agreement is necessarily premised upon the

circumstances and situation extant when the parties settled their differences.

Discussions between the Trustee and Fleet to resolve the Trustee's potential claims

against Fleet, including a fraudulent conveyance claim to avoid Fleet's liens, resulted in the

Settlement Agreement.  The specific terms of the Settlement Agreement make it clear that

the Trustee and Fleet intended to settled all of their claims against one another.  See

Settlement Agreement, ¶ 2, which provides:

> 2.     Scope of Settlement.   Except as specifically
> provided below, this Agreement is intended to globally settle
> with prejudice any and all claims (pre-petition and post-petition)
> the Trustee and the Debtors' estates have or may have against:
> [Fleet] . . . . Without limiting the generality of the foregoing, this
> Agreement will completely resolve and be deemed as a
> settlement with prejudice of the Avoidance Action and
> Surcharge Motion, all adversary proceedings, contested matters
> and other core case issues and claims among the parties and
> their respective professionals and advisors, which includes,

15

> without limitation, objections to the allowance of claims of the
> Agent and Lenders. . . .

The foregoing "release" language clearly evidences that Fleet was buying peace for all lenders for any claims by Debtors whatsoever. Of further significance in determining the intent behind the Settlement Agreement is that at the time they were negotiating the Settlement Agreement, Debtors and Fleet thought that preference recoveries would be less than $1.1 million. Instead, the Trustee's efforts led to the recovery of more than double the expected amount, or $2,345,519. In achieving the larger than anticipated recovery, the Trustee incurred attorney's fees of $593,852, costs and $200,000 in fees payable to DSI for its analysis of preference claims.

Therefore, the Court's determination of the intent of the parties which leads to the interpretation of the Settlement Agreement flows from a relatively few salient facts.

1. The Trustee was preparing to challenge Fleet's liens as avoidable fraudulent conveyances.

2. The Trustee and Fleet entered into settlement negotiations to settle completely the Trustee's potential claims against Fleet.

3. The negotiations resulted in the Settlement Agreement which, in addition to the economic terms, provided for the Trustee's release of Fleet on very broad terms. Settlement Agreement, ¶ 5.

4. The settlement negotiations took place when the preference recoveries were expected to be substantially less than $1.1 million.

The Settlement Agreement provided significant benefits to Fleet.  In addition to a

potential distribution at issue here, Fleet received a release from liability, avoided litigation

over its liens and obtained an allowed unsecured claim of $23,675,045.65.  Fleet also

received indemnification and the turn over of funds held in escrow totaling approximately

$256,000.

## a. Preference Recoveries

In achieving the greater than expected preference recoveries, the Trustee incurred

attorneys' fees of $593,852, plus costs, including mediator fees.  Trustee Affidavit ¶ 11.  If

Fleet's position on the Settlement Agreement is correct, the distribution from the preference

recoveries would be as follows:

| | |
|---|---|
| Preference Recoveries | $2,345,519 |
| Creditors' Gross Share | $1,100,000 |
| Less Expenses[12] | {$  593,852} |
| Creditors' Net Share | $  506,148 |
| Fleet's Share | $1,245,519 |

On the other hand, if the Trustee is correct, the distribution would be:

| | |
|---|---|
| Preference Recoveries | $2,345,519 |
| Creditors' Share | $1,100,000 |
| Less Expenses | {$  593,852} |
| Fleet's Share | $  651,667 |

The difference in recovery is substantial depending on against whom the costs and

expenses are applied.  Fleet would impose all of the costs and expenses on the Trustee's

---

[12]  The expenses are an estimate at this time.  The Court's calculations are for illustrative
purposes and do not represent findings or a conclusion of the actual amount.

portion of the preference recoveries, i.e., the $1,100,000 payable under the Settlement Agreement, meaning that Fleet rather than the creditors would enjoy the gross recovery amount.

Fleet's interpretation results in an unworkable and clearly unintended result. The Settlement Agreement is definitive that the Trustee is first entitled to receive "up to . . . $1,100,000 of <u>gross</u> recoveries. Settlement Agreement ¶ 4(b) *[emphasis added]*. If Fleet is correct, the Trustee would not receive $1.1 million and the bulk of the settlement proceeds would be paid, really refunded, to Fleet. In order to adopt Fleet's suggested interpretation, the Court would have to ignore the plain language in the Settlement Agreement that Fleet's receipt of up to $3.1 million - after the Trustee's receipt of $1.1 million "of <u>gross</u> preference recoveries" (Settlement Agreement ¶ 4(b)) is "of <u>net</u> recoveries . . . ." Id at ¶ 4(c) *[emphasis added]*.

It is therefore clear from the Settlement Agreement itself that the Trustee's position on the preference recoveries is correct.

### b. <u>Exopack</u>

The Court earlier in this decision (*see* Background at pp. 1-4) referred to the asset sale to Exopack and the litigation that resulted from the sale. When Fleet and the Trustee entered into the Settlement Agreement (i.e., March 3, 2005), the litigation between the Estate and Exopack was pending. In the Settlement Agreement, the Trustee and Fleet adressed the possibility that Exopack would recover on its claim against the Estate. Paragraph 7 of the

18

Settlement Agreement requires the Trustee to reserve $270,000 to secure the Trustee's indemnification of Fleet with respect to certain claims by Exopack.  The indemnification provided for in Paragraph 8 of the Settlement Agreement[13] is only for claims which are not direct claims by Exopack against Fleet.  Thus, the indemnification is only for those claims Exopack may have against the Debtors and indirectly against Fleet.[14]

On September 11, 2006, the Court approved a settlement among the Estate, ceratin Taxing Authorities and Exopack [Docket No. 1538] which resulted in an exchange of general releases by and among the Estate, Exopack and the taxing authorities fully and completely releasing any and all claims that Exopack had against the Estate, including those claims regarding Exopack's obligation to pay certain tax liabilities. [Docket No. 1538].

Fleet received notice of the settlement with Exopack and did not file an objection.  Additionally, Fleet was a party to an appeal which was settled as part of the Exopack settlement, and Fleet joined in the dismissal of that appeal.  Notwithstanding Fleet's

---

[13] Paragraph 8 provides, in part, that:

> 8.    Indemnification by Trustee.  The Trustee shall indemnify, defend and hold [Fleet] . . . harmless of and from any and all claims, causes, suits, proceedings and appeals asserted or commenced or continued by Exopack, . . .; provided, however, that the Trustee shall not be liable or obligated to indemnify or defend [Fleet], with respect to any direct claim (as opposed to an indirect or derivative claim by or through the Debtors' estates) asserted by [Fleet]. . .; provided however, if any such alleged direct claim is determined to be derivative or otherwise within the scope of the indemnity above, then the Trustee and Debtors' estates shall then be liable to indemnify for any amount finally determined to be due to Exopack . . . .

[14] At the closing on the sale of the Debtors' assets, all the proceeds were paid to Fleet.  Thus, if any senior lien was established, the payment would have to be made by Fleet.

participation, Fleet did not seek to participate in the settlement or request a release, nor did Fleet raise any issues with the Trustee with respect to the release until after the Court approved the Exopack settlement.[15]

Accordingly, there are no claims left that could be subject to the indemnification. The Trustee has fully and completely resolved all disputes with Exopack as evidenced by the exchanges of the general realeases. The only Exopack claims that could exist would be direct claims between Exopack and Fleet, and for such claims the Trustee did not provide indemnification.

Therefore, the Trustee is not required to maintain the reserve to secure the indemnification because there are no circumstances for which the Estate would be required to provide indemnification to Fleet.

### c. **Cash on Hand**

Fleet has identified additional sum to which it believes it is entitled.

| | |
|---|---|
| Refunds | $ 78,889 |
| Turnover from prior trustee | $ 45,014 |
| Bank accounts | $142,563 |
| Interest | $ 59,000 |
| Total | $325,466 |

---

[15] Despite the Trustee's request that Exopack release Fleet, Exopack has yet to do so. The Court has reviewed the docket and it appears that Fleet has not taken any action to determine if it has any accountability to Exopack.

The primary issue which Fleet's claim to the foregoing amounts raises is its entitlement to "Cash on Hand" which the Trustee held at the time the parties entered into the Settlement Agreement ("Cash on Hand").  The Trustee counters that  Fleet is entitled under the Settlement Agreement only to its portion of proceeds from future recoveries.  The Cash on Hand is not a "recovery" according to the Trustee and therefore is not payable under the Settlement Agreement.

Before entering into the Settlement Agreement, the Estate held Cash on Hand of $266,476, plus $73,525 that had been paid by Fleet to make professional fee payments in connection with certain settlements the Trustee had reached with some of the professionals who had been employed while the cases were pending under Chapter 11. [Trustee Affidavit ¶ 5].  Fleet asserted an interest in the Cash on Hand pursuant to the security interest granted Fleet pre- and post-petition. [Trustee Affidavit ¶ 5].  Upon the approval of the Settlement Agreement, Fleet's right to distribution from the Estate was governed by the Settlement Agreement and not preexisting security interests.  The Settlement Agreement clearly contemplated that it was to be a global resolution of all claims by Debtors against Fleet and Fleet against the Estate.  Thus, the Settlement Agreement provided that "[e]xcept as specifically provided below, this [Settlement] Agreement is intended to globally settle with prejudice any and all claims (pre-petition and post-petition) . . . (c) [Fleet's] Claims against the several [Debtors'] Estates arising or relating to such financial accommodations or otherwise. . . ."  Settlement Agreement at ¶ 2.  Fleet waived any additional secured and

priority claim it may have had.  Fleet's rights to receive distributions were to be governed solely by the Settlement Agreement.  Settlement Agreement, ¶ 6[16].

"Net recoveries" as used in Paragraph 4(c) of the Settlement Agreement does not include the Cash on Hand because the Cash on Hand did not constitute a recovery.  Fleet's right to receive a distribution from "recoveries" only includes the proceeds from future recoveries.

The Cash on Hand is to be available to pay the expenses of the Estate, including professional fees incurred.  The Cash on Hand was not as a result of actions taken by the Trustee to "recover" an asset [Trustee Affidavit ¶ 5], and the parties never contemplated that the Estate would pay over to Fleet the Cash on Hand. [Trustee Affidavit ¶ 8].  Construing the Settlement Agreement as having Fleet pay the Estates $3.1 million while maintaining a claim against the Cash on Hand is illogical.  The correct reading of the Settlement Agreement and that which gives effect to the intent of the parties is that the Cash on Hand was an asset of the Debtors free and clear of the claims of Fleet and not a "recovery" subject to distribution pursuant to Paragraph 4 of the Settlement Agreement. [Trustee Affidavit ¶ 8].

The Court agrees with the Trustee.  If Fleet is correct, its $3.1 million payment was,

---

[16]  Paragraph 6 provides:

> 6.      Waiver of Priority, Net Claim. [Fleet] hereby waives the priority of any claim [Fleet] may have, with all of [Fleet's] remaining claims being allowed general unsecured claim having priority in distribution pursuant to Bankruptcy Code § 726(a)(2) in the amount of $23,675,045.65 ("Lenders Allowed Unsecured Claim").

in part, merely an advance to be reimbursed in the future from sums certain.    Fleet exchanged its lien on the "Cash on Hand" for the benefits of the Settlement Agreement. Those benefits included the possibility of recoveries, not the certainty of "Cash on Hand." Fleet is therefore not entitled to "Cash on Hand."

### d. Miscellaneous Issues and Rulings

Fleet also seeks the following payments from the Trustee:

a.        An accounting of a $50,000 escrow the Trustee collected.  The Trustee shall provide the accounting.

b.        Release from San Bernadino of $80,000 held in escrow by the taxing authority, and payment to Fleet. Settlement Agreement, ¶ 13(b).  The Trustee has received $81,005.69 and shall pay to Fleet the released escrow funds.

c.        Recovery from Europackaging.    The Settlement Agreement requires the Trustee to pay Fleet from any recovery against Europackaging.      Settlement Agreement, ¶ 13(d).  The Trustee collected $91,483, and is entitled to reimbursement of fees and expenses.  It is unclear what amount of fees and expenses are appropriate.  The Trustee shall provide Fleet with an accounting of the fees and expenses attributable to the Europackaging matter and if the Trustee and Fleet are unable to agree on an appropriate amount, the dispute shall be submitted to the Court to resolve.

### e. **Accounting**

The Court's decision that the Settlement Agreement results in a payment of net preference recoveries means that Fleet is entitled to an accounting of the professional fees and expenses attributable to the gross recoveries.  The Court directs the parties to confer about a schedule for the accounting, any objections for fees and expenses and a hearing, if necessary, to present those objections, and to submit an agreed upon scheduling order.


The Court will issue an Order in conformity with the rulings in this Opinion.



Dated: October 17, 2007

KEVIN GROSS, U.S.B.J.

24